**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Leroy MITCHELL,**
**Defendant-Appellant.**

No. 86–1049.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1986.
Decided March 19, 1987.

Hayden Aluli, Asst. Fed. Public Defender, Honolulu, Hawaii, for defendant-appellant.

Theodore G. Meeker, Honolulu, Hawaii, for plaintiff-appellee.

Before NELSON, REINHARDT and WIGGINS, Circuit Judges.

NELSON, Circuit Judge:

Defendant Leroy Mitchell is currently incarcerated under a two-year prison sentence. He contends that his conviction under 18 U.S.C. § 871 (1982) for "knowingly and willfully ... [making] a threat to take the life or to inflict bodily harm upon the President of the United States" should be reversed because his threats to kill President Reagan were the product of an illegal arrest at Honolulu airport. He also challenges the denial of his motion for judgment of acquittal on the ground that, viewing the evidence in the light most favorable to the prosecution, no reasonable factfinder could have found beyond a reasonable doubt that his statements constituted a true threat to kill the President. In addition, he argues that the district court should not have rejected his proposed jury instruction requiring proof of a subjective intent to threaten. We have jurisdiction under 28 U.S.C. § 1291 (1982) and affirm the district court's judgment.

### 1. *BACKGROUND*

On April 9, 1985, four days before defendant Mitchell's arrest, Special Agent Colter of the Secret Service received a telex from the American embassy in Singapore alerting the Honolulu office of the Secret Service that Mitchell had been overheard making threats against the life of President Reagan. Mitchell, a Vietnam veteran who was receiving a disability pension from the Veteran's Administration, had been at the embassy trying to contact the guardian through whom he received his payments in order to obtain money to return to the United States. The embassy's telex indicated that Mitchell had a history of making threats against the President and was also suspected of cocaine smuggling. The embassy officials noted that they were not certain whether Mitchell would fly directly to Honolulu from Singapore or arrive from some other country. They estimated an arrival date of April 11, 1985.

In response to the telex, Agent Colter requested the United States Customs office in Honolulu to place a lookout on the Treasury Enforcement Communications System ("TECS") (a computer information system used to alert customs officials to potential or known violators of federal laws), to notify him immediately if Mitchell appeared, and to hold him for questioning by the Secret Service. Mitchell arrived at the Honolulu International Airport two days after the projected arrival date, on April 13, 1985, at 10:14 a.m. When the customs inspector asked Mitchell where he had been traveling, Mitchell responded, "I've been looking for Ronald Reagan." The customs agent entered Mitchell's name into the TECS system, and the computer indicated that he was wanted for questioning by the Secret Service.

Customs agents removed Mitchell from the customs line and turned him over to other customs agents, who retained his passport and airline ticket. Because of the nature of the allegations, the agents moved Mitchell a distance of fifty to sixty feet to a small search room to conduct a brief frisk for weapons, followed by a more thorough pat-down for drugs. After finding no weapons or contraband, the customs agents moved Mitchell from the search room to the supervisor's office, where he remained while customs agents inspected his baggage and while he awaited the arrival of Agent Colter.

At the same time that Mitchell was removed to the search room, a customs agent called Agent Colter at his home, twenty miles from the airport. Pursuant to Secret Service policy to have two agents present when investigating a potentially dangerous suspect, Colter called Agent Spector, the duty agent for the day, to inform him that Colter would pick him up on the way to the airport. Spector's apartment was a fifteen to twenty minute drive from the airport. Colter left his home immediately after phoning Spector.

Agents Colter and Spector arrived at the airport at 11:30 a.m. After the customs officials gave the two agents a brief summary of the events of the preceding hour, Agent Colter introduced himself to Mitchell and informed him that he had come to question him about the statements he made regarding the President while in Singapore. In response, Mitchell made some remarks about royalties that Mercury Records owed him and then asserted, without any further questioning: "I'm going to kill Reagan and then I'm going to kill all of you ... I'll do what I said I'll do." Mitchell added various obscene remarks and threatened to drown President Reagan in the Atlantic Ocean. Following these statements, Agents Colter and Spector arrested Mitchell at about 11:40 a.m. Mitchell allegedly made additional threats to kill the customs and Secret Service agents. He also said that he was Mahatma Gandhi and the son of Nehru and that he had a guerilla army in the Philippines.

Mitchell was indicted on May 9, 1985 for violating 18 U.S.C. § 871 by knowingly and willfully threatening the life of President Reagan at Honolulu airport. He filed a notice of intention to rely on the insanity defense, but withdrew the notice before trial. The district court denied Mitchell's motion to suppress the statements made at the Honolulu airport and also denied a mo-

tion for judgment of acquittal after his conviction by jury trial on December 10, 1985. The district court sentenced Mitchell to two years in prison and imposed the special $50 assessment required by 18 U.S.C. § 3013 (1982). Mitchell filed a timely notice of appeal on February 20, 1986.

## II. *MOTION TO SUPPRESS DEFENDANT'S STATEMENTS*

### A. *Standard of Review*

This court reviews motions to suppress evidence de novo. *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir.1986). The district court's findings of fact at a suppression hearing are upheld unless they are clearly erroneous. *United States v. Feldman*, 788 F.2d 544, 550 (9th Cir.1986). The ultimate conclusion of the lawfulness of a seizure, however, is a mixed question of law and fact that is reviewed de novo. *United States v. McConney*, 728 F.2d 1195, 1200–04 (9th Cir.), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). In the present case, the district court adopted the findings and recommendation of the magistrate's report on the defendant's motion to suppress evidence.

### B. *Analysis*

Mitchell contends that his seizure at Honolulu airport ripened into a de facto arrest without probable cause in violation of the fourth amendment, rendering his statements regarding the President suppressible as the fruit of an illegal arrest. He claims that his Honolulu threat to kill President Reagan was not spontaneous and unsolicited, but was prompted by the "functional equivalent of express questioning," and thus should be excluded as tainted evidence. We disagree.

 We begin our analysis with a basic proposition. A person who is detained illegally is not immunized from prosecution for crimes committed during his detention. A person does not have a license to kill a police officer merely because the officer arrested him without probable cause. Here, the crime was "knowingly and willfully ... mak[ing] a[ ] ... threat against the President." 18 U.S.C. § 871. When Mitchell made his threat at the Honolulu airport, he committed a felony. The mere fact that he may have been arrested illegally does not serve to bar prosecution of that offense.

Illegally obtained evidence of a crime is subject to the exclusionary rule. The rule does not, however, bar prosecution of the crime itself. As Justice Holmes noted, "[i]f knowledge of [the facts obtained illegally] is gained from an independent source they may be proved like any others." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920) (quoted in *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)).

Here, the evidence that Mitchell seeks to bar and the crime itself are one and the same. Under Mitchell's theory, *any* evidence of his threat must be excluded. Although his argument is cast in evidentiary terms, what Mitchell seeks in reality is immunity from prosecution for his crime; for it is the crime itself—the making of a threat against the President—not merely evidence of a previously committed crime, that is allegedly the fruit or product of the illegal arrest.

Committing a crime is far different from making an inculpatory statement, and the treatment we afford the two events differs accordingly. An inculpatory statement usually relates to a previously committed illegal act; there is nothing unlawful about the statement itself. A crime, on the other hand, whether committed by word or deed is by definition an act that violates the law. We exclude inculpatory evidence when it is obtained as a result of an unlawful search or seizure. We have never, however, applied the exclusionary rule as a bar to the prosecution of a crime.

One commentator has suggested that in some circumstances the prosecution of crimes might be prohibited under the exclusionary rule. Professor LaFave acknowledges that in most cases a crime would not come within the "reasonable bounds" of that rule because the taint of the unlawful arrest is ordinarily dissipated by the com-

mission of the independent act. W. La-Fave, *Search and Seizure* § 11.4, at 679 (1978). Nonetheless, he contends that when the crime is one that is readily predictable (such as defensive physical actions taken by a suspect), prosecution should be barred in order to deter unlawful police conduct.[1]

We do not believe that the exclusionary rule is the proper vehicle for determining whether a crime should be immunized from prosecution. In short, we reject the suggestion that in some instances the rule should be extended to bar prosecution of the crime itself. We prefer a different approach.

Two other circuits have considered the subject of the commission of crimes committed while a person is being illegally detained. In *United States v. Bailey*, 691 F.2d 1009 (11th Cir.1982), the Eleventh Circuit implicitly rejected the fourth amendment approach urged by Mitchell. In *Bailey*, the court ruled that, "notwithstanding a strong causal connection in fact between lawless police conduct and a defendant's response, if the defendant's response is itself a new, distinct crime, then the police constitutionally may arrest the defendant for that crime." *Id.* at 1016–17. The Eleventh Circuit recognized that a contrary rule "would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Id.* The First Circuit, on the other hand, used a fourth amendment analysis similar to La-Fave's in concluding in *United States v. King*, 724 F.2d 253 (1st Cir.1984), that the exclusionary rule was inapplicable to the facts of that case because the new offense constituted an "independent intervening act." *Id.* at 256. We have employed a causal analysis similar to that used by the First Circuit when the question was whether to exclude evidence relating to a previously committed offense. *See, e.g., United States v. Perez-Esparza*, 609 F.2d 1284, 1289 (9th Cir.1980). However, when the question is whether to bar the prosecution of a new crime, we do not believe a causal analysis to be appropriate.

■ We do not mean to suggest that unlawful government conduct may not serve as a basis for immunizing a person from criminal liability. Entrapment and "outrageous government conduct" are examples of instances in which we, and other courts, have held that persons may not be convicted of particular offenses. When it is claimed that the police have exploited an illegal arrest by creating a situation in which a given criminal response is predictable, we believe that a better approach would be to determine whether the government's prosecution of the crime would abridge fundamental protections against unfair treatment. *See, e.g., United States v. Stenberg*, 803 F.2d 422, 428–32 (9th Cir. 1986) (discussing both "outrageous government conduct" and entrapment as defenses to criminal prosecutions). Affording a substantive defense to a crime committed during an illegal detention when particular circumstances so warrant provides a more rational and measured way of protecting individual rights than does the application of fourth amendment analysis to all such cases. Equally important, extending the exclusionary rule to bar prosecution of new crimes is simply unwarranted both from a historical and a practical standpoint.

In the case before us, Agent Colter introduced himself to Mitchell upon arriving at the airport and told him he was there for the purpose of investigating the statements Mitchell had made in Singapore about President Reagan. Mitchell immediately responded by making present, new threats against the President. Prosecuting Mitchell for this new crime does not offend any sense of fair treatment or fair play, regardless of the legality or illegality of his detention. Mitchell was in no way pressured or

---

1. LaFave would not exclude evidence of threats and attempted bribes. He argues that because these acts are "so infrequent and unpredictable ... admission of the evidence ... is not likely to encourage future illegal arrests." *Id.*

induced to make the new threat against the President. He committed the offense "knowingly and willingly." *Cf Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940) (confession resulting from five days of questioning following warrantless arrest was involuntary). That he may have been detained illegally at the time of the commission of the crime (and we do not suggest that he was) is simply irrelevant.

## III. *SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE DENIAL OF THE MOTION FOR JUDGMENT OF ACQUITTAL*

### A. *Standard of Review*

When reviewing the sufficiency of the evidence to support a conviction, an appellate court must determine whether viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 821 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985).

### B. *Analysis*

Mitchell contends that no rational trier of fact could have concluded that his statements were true threats beyond a reasonable doubt because (1) the facts show that his statements were expressions either of political hyberbole or of anger toward the law enforcement agents, (2) he was incapable of actually carrying out the threats, and (3) the irrational nature of other remarks he made at the time show that his threats were made in jest.

▪ Whether a defendant's words constitute a true threat under 18 U.S.C. § 871 must be determined in light of the entire factual context of the defendant's statements. *Watts v. United States,* 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam); *United States v. Merrill,* 746 F.2d 458, 462 (9th Cir.1984),

*cert. denied,* 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985); *Roy v. United States,* 416 F.2d 874, 876 (9th Cir.1969). The court may look at the surrounding events, the reaction of the listeners, and whether the words are expressly conditional. *Watts,* 394 U.S. at 708, 89 S.Ct. at 1401 (conditional statement made at political rally that provoked audience's laughter was mere political hyperbole). The Ninth Circuit has interpreted § 871 to require

"only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President, and that the statement not be the result of mistake, duress, or coercion."

*Merrill,* 746 F.2d at 462 (quoting *Roy,* 416 F.2d at 877-78).

▪ There is no evidence in the record that Mitchell uttered his statement as the result of "mistake, duress, or coercion." His reaffirmation of his previous threats— "I'll do what I said I'll do"—certainly expresses hostility, but does not preclude a rational factfinder from finding that the words were more than mere expressions of anger directed at the government agents. In addition, Mitchell's statements were not made in the context of political commentary on the government. The agents who heard the statements apparently took them quite seriously. Most cases arising under § 871 involve a variety of factual circumstances that "should be left to the trier of fact." *Merrill,* 746 F.2d at 463. Therefore, we find no support for reversing the jury's determination that Mitchell's words were not merely political hyperbole.

▪ Mitchell's second argument, that he was incapable of carrying out the threats, misapprehends legal precedent in this circuit. As explained in *Merrill,* "[u]nder sec-

tion 871, the threat itself is the crime. We have therefore upheld the section 871 conviction of a defendant who had no apparent capacity to carry out the threat." *Merrill,* 746 F.2d at 462 (citation omitted) (citing *United States v. Melendy,* 438 F.2d 531, 532 (9th Cir.1971) (incarcerated defendant convicted for threatening the life of the President)).

 Finally, Mitchell argues that because of statements he made contemporaneously, such as the claim that he was Mahatma Gandhi, his threats should reasonably have been regarded as "ludicrous and made in jest." Although it is true that a series of bizarre remarks may tend to lower a person's credibility, potential assassins may well be irrational. Hence, to dismiss threats merely because a person expresses himself in an outlandish, illogical manner may defeat § 871's purpose of apprehending people who potentially pose a threat to the President. Therefore, the district court did not err in denying the motion for judgment of acquittal.

## IV. *THE INTENT REQUIREMENT OF 18 U.S.C. § 871*

### A. *Standard of Review*

This court reviews the district court's rejection of a defendant's proposed jury instruction for abuse of discretion. *United States v. Wellington,* 754 F.2d 1457, 1463 (9th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985).

### B. *Analysis*

 As noted above, the Ninth Circuit has adopted an objective intent standard for interpreting the requirement that a threat be made "knowingly and willfully." *Roy,* 416 F.2d at 877; *see also Merrill,* 746 F.2d at 462. The objective test requires only that the defendant intentionally make a statement that a reasonable person under the circumstances would interpret as a seri-

ous expression of intent to harm the President. *Id.* In view of the clear precedent in this circuit on the intent requirement of § 871, the district court did not abuse its discretion in rejecting Mitchell's proposed jury instructions for a subjective willfulness test.

## *CONCLUSION*

The district court properly concluded that Mitchell's statements threatening the life of President Reagan were not suppressible as the fruit of an illegal arrest. The district court also did not err in denying Mitchell's motion for judgment of acquittal or his request for a jury instruction requiring proof of a subjective intent to threaten the president. We therefore affirm Mitchell's conviction under 18 U.S.C. § 871.

AFFIRMED.