UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-4022
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

GORDON LYNN SMITH,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Eastern District of Texas
_____
(November 10, 1993)


Before GARWOOD, DAVIS and SMITH, Circuit Judges.

GARWOOD, Circuit Judge:

        In this interlocutory appeal, plaintiff-appellant the United
States challenges an order of the district court dismissing the
second of two counts charging defendant-appellant Gordon Lynn Smith
(Smith) with knowingly and willfully threatening the life of then-
President Bush, in violation of 18 U.S.C. § 871.  The district
court determined that the substantive defense of outrageous
government conduct arose as a matter of law when questioning by a
Secret Service agent led to the renewed threats against the
President charged in Count Two of the indictment.  We determine

that the record does not support dismissal on the basis of outrageous government conduct and, accordingly, reverse.

## Facts and Proceedings Below

Defendant-appellee Smith is an inmate in a psychiatric unit at the Skyview Unit of the Texas Department of Criminal Justice in Rusk, Texas. On October 23, 1991, Smith told another inmate that he (Smith) was going to kill President Bush when he got out of the penitentiary. Correctional Officer R. Jordan overheard this comment and reported the threats to the warden of the Skyview Unit, Joe Collins (Collins). Later that same day, Collins interviewed Smith in his office. Collins had a masters degree in psychology and had served four years as a prison psychologist. The warden did not question Smith about his feelings toward the President, but instead focused on Smith's mental condition; he concluded that Smith was not psychotic and that "his psychiatric disorder appeared to be in good remission." Following the interview with Smith, Collins reported the threat to Secret Service Agent Lynn Holliman (Holliman).

Two days later, on October 25, 1991, Holliman and Collins interviewed Smith in Collins' office. Holliman's intent in questioning Smith was to determine whether Smith posed a serious threat to the President. The government concedes that neither Holliman nor Collins gave Smith complete warnings under *Miranda v. Arizona*, 86 S.Ct. 1602 (1966), prior to this interview.[1] During

---

[1] At a plea hearing held on Smith's attempted plea of guilty to Count One, Holliman testified:

"I did not advise him his rights per Miranda fully. . .

2

the interview, Smith repeated his threat to kill President Bush.[2]

On June 17, 1992, a grand jury returned an indictment against Smith, charging him with two counts of knowingly and willfully threatening the life of then-President Bush, in violation of 18 U.S.C. § 871(a). Count One was based on Smith's threats made to the other inmate on October 23; Count Two was based on the threats made in the warden's office on October 25 in the presence of Holliman and Collins.

Smith attempted to plead guilty to Count One, but the district court would not accept his plea because of the lack of evidence supporting that count. The correctional officer who overheard the October 23 threat had died in a car accident some time after October 25, and the inmate to whom the threat was expressed would not make a statement.[3]

Smith then moved to "suppress the use of any statements made

---

. He was told the interview had to be entirely voluntary on his part. He was free to stop at any time and he could leave at any time there. I did not tell him the statements about entitlement [to be represented by counsel] to this specific reason. I didn't tell him about this. I was not there to question him about the statement on the 23rd. I was there to question him about his feelings towards the President and the statements he was making there. I never specifically asked him if he did or did not make the statement on the 23rd."

[2]     Smith also made threats against President Bush to the prison guard who conducted him from his cell to the warden's office, but no charges arose from these statements. The guard did not interrogate Smith.

[3]     According to counsel for the government at oral argument, the inmate to whom the threats were expressed may now be willing to cooperate with the government in its attempts to prosecute Smith on Count One, the October 23 threat.

by Defendant while he was in custodial interrogation" on October 25, because he had not been given *Miranda* warnings. Following an evidentiary hearing on this motion, the district court agreed with Smith, ruling that the interview in the warden's office was a custodial interrogation requiring *Miranda* warnings, warnings which admittedly were not fully given.[4] The district court based its ruling on the grounds that Smith was in custody at the time of the interview, that he knew that he was talking to a government agent and the warden, and that Collins and Holliman "asked questions, and set up a coercive environment that they should have known was likely to elicit incriminating responses from the defendant."

The district court did not suppress the evidence of the October 25 threat on the basis of the illegal interrogation, however. Instead, it dismissed Count Two with prejudice, finding that the substantive defense of outrageous government conduct was established as a matter of law because Holliman and Collins should have known that Smith "in discussing his first threat to kill President Bush, would again threaten to kill the President."[5]

---

[4]   Holliman told Smith that he was not under arrest, that the interview was voluntary, and that he did not have to answer any questions. Collins informed Smith that he was free to leave the office at any time. However, neither Holliman nor Collins told him that he had the right to have a lawyer present or that anything he said could be used against him in a court of law. The decision not to give Smith his full *Miranda* warnings was deliberate; Holliman wanted to ensure that he had the information necessary to protect the President.

[5]   We note, however, that the undisputed evidence is that at the October 25 interview Smith was not asked about the October 23 threat; nor is there any evidence that he discussed the October 23 threat at the meeting with Holliman and Collins. Holliman and Collins and the guard who took Smith to the October 25 interview were the only witnesses at the suppression hearing.

The government appeals the dismissal of Count Two, pursuant to 18 U.S.C. § 3731.

## Discussion

I.   *Miranda* Ruling

Before the district court, the government took the position, *inter alia*, that Smith was not "in custody" for *Miranda* purposes at the October 25 interview.  On appeal, however, the government does not take the position that the district court's finding that Smith was in "custody" during the interview in Collins' office is clearly erroneous.  The government focuses instead on the district court's *sua sponte* dismissal of Count Two on the basis of outrageous government conduct.

The government *does* take the position that whether Smith was in custody for *Miranda* purposes during the October 25 interview is an issue that the district court could have properly resolved either way.  The issue is indeed a close one.  It is generally accepted that "a prison inmate is not automatically always in `custody' within the meaning of *Miranda*." *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985), *cert. denied*, 107 S.Ct. 114 (1986).  *See also United States v. Willoughby*, 860 F.2d 15, 23-24 (2d Cir. 1988), *cert. denied*, 109 S.Ct. 846 (1989); *Flittie v. Solem*, 751 F.2d 967, 974-975 (8th Cir. 1985), *cert. denied*, 106 S.Ct. 1223 (1986).  While a prison setting may increase the likelihood that an inmate is in "custody" for *Miranda* purposes, here both Holliman and Collins told Smith that he was not required to say anything and that he was free to leave the office at any time.  It may be conceivable, on the other hand, that, even in the

5

face of these statements, Smith might not have felt free to leave and might have perceived the interview as a custodial interrogation.

In any event, assuming, *arguendo*, that a violation of *Miranda* occurred, nevertheless the evidence of the renewed threat charged in Count Two is not inadmissible due to the lack of *Miranda* warnings, because the threat constituted a new crime rather than evidence of a prior offense. *United States v. Kirk*, 528 F.2d 1057, 1062 (5th Cir. 1976) ("no fifth amendment problem is presented when a statement is admitted into evidence which is not confessional in nature, but in and of itself constitutes the crime charged"). *See also United States v. Garcia-Jordan*, 860 F.2d 159, 160-161 (5th Cir. 1988); *United States v. Mitchell*, 812 F.2d 1250, 1254 (9th Cir. 1987) (rejecting the suggestion that the exclusionary rule should be extended, in some circumstances, to bar prosecution of the crime itself).[6] On remand, the alleged *Miranda* error does not preclude the government from introducing evidence of, or prosecuting Smith for, the threats made during the October 25 interview.

---

[6] "Committing a crime is far different from making an inculpatory statement, and the treatment we afford the two events differs accordingly. An inculpatory statement usually relates to a previously committed illegal act; there is nothing unlawful about the statement itself. A crime, on the other hand, whether committed by word or deed is by definition an act that violates the law. We exclude inculpatory evidence when it is obtained as a result of an unlawful search or seizure. We have never, however, applied the exclusionary rule as a bar to the prosecution of a crime." *Mitchell*, 812 F.2d at 1253.

6

II.  Outrageous Government Conduct

The district court's dismissal of Count Two on the ground of outrageous government conduct was *sua sponte*.  The possible existence of a substantive defense to the second count was not raised at the suppression hearing, and the government had no notice that the district court was considering any issue but the *Miranda* question in its ruling on Smith's motion to suppress.  Although it was error for the district court to so rule without providing the government adequate notice, we address the merits of the court's ruling.

The district court relied on this Court's decision in *United States v. Garcia-Jordan*, 860 F.2d 159 (5th Cir. 1988).  There, we stated that, "in extreme cases, outrageous police conduct may afford the accused a substantive defense to the prosecution" of a crime committed during an illegal stop or detention.  *Id*. at 161.[7] In order to benefit from the defense of outrageous government conduct, Smith bears the burden of proving that he was not an active participant in the criminal activity and that the government was overinvolved in the charged crime.  *United States v. Arditti*,

---

[7]     The district court seemed to treat the substantive defense mentioned in *Garcia-Jordan* as separate from the defenses of entrapment or outrageous government conduct.  The defense, as contemplated by the district court, would apply where police conduct creates a situation "in which a given criminal response is predictable." *United States v. Mitchell*, 812 F.2d at 1254. Contrary to the district court's interpretation, the defense discussed in *Garcia-Jordan* is that of outrageous government conduct.  Both *Garcia-Jordan* and *Mitchell*, the Ninth Circuit case on which the *Garcia-Jordan* court relied, refer to "outrageous police conduct" or "[e]ntrapment and `outrageous government conduct.'" *Garcia-Jordan*, 860 F.2d at 161; *Mitchell*, 812 F.2d at 1254.

955 F.2d 331, 343 (5th Cir.), *cert. denied*, 113 S.Ct. 597 (1992) and 113 S.Ct. 980 (1993). This defense is available only where the conduct of the law enforcement officials is so outrageous that it violates notions of fundamental fairness implicit in the Due Process Clause of the Fifth Amendment. *United States v. Yater*, 756 F.2d 1058, 1065 (5th Cir.), *cert. denied*, 106 S.Ct. 225 (1985) (citing *United States v. Russell*, 93 S.Ct. 1637, 1643 (1973)). This Court has never invalidated a conviction on this ground. *United States v. Collins*, 972 F.2d 1385, 1396 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 1812 (1993).

In *Garcia-Jordan*, we relied on the Ninth Circuit's opinion in *United States v. Mitchell*, 812 F.2d at 1254, describing the substantive defense of outrageous government conduct:

> "We do not mean to suggest that unlawful government conduct may not serve as a basis for immunizing a person from criminal liability. Entrapment and `outrageous government conduct' are examples of instances in which we, and other courts, have held that persons may not be convicted of particular offenses. When it is claimed that the police have exploited an illegal arrest by creating a situation in which a given criminal response is predictable, we believe that a better approach would be to determine whether the government's prosecution of the crime would abridge fundamental protections against unfair treatment. Affording a substantive defense to a crime committed during an illegal detention when particular circumstances so warrant provides a more rational and measured way of protecting individual rights than does the application of fourth amendment analysis to all such cases." 812 F.2d at 1254 (internal citation omitted).

Neither the *Garcia-Jordan* court nor the *Mitchell* court held that the outrageous government conduct defense was available on the facts before them. In *Garcia-Jordan*, a defendant moved to suppress his statement to a Border Patrol agent, in which he falsely claimed

8

to be a United States citizen, contending that the agent stopped his vehicle illegally. Without deciding the legality of the stop, this Court affirmed the district court's denial of the motion to suppress, holding that the exclusionary rule did not bar the defendant's prosecution for the new crime of his false claim to citizenship, which was different from any conduct that might have led to the allegedly illegal stop. *Garcia-Jordan*, 860 F.2d at 161.

The facts of *Mitchell* are similar to those in the present case. Authorities in Singapore informed Secret Service agents in Hawaii that Mitchell, then in Singapore, had made several threats against President Reagan, and that Mitchell was planning to return to the United States. Several days later, when Mitchell was proceeding through customs in Hawaii, he made comments to a customs agent that caused the agent to check computer records for information on Mitchell; these records alerted the customs agent to the fact that Mitchell was wanted for questioning by the Secret Service. While waiting for the Secret Service agents to arrive, custom agents took Mitchell to a small room and searched him for contraband and weapons. Mitchell was detained for approximately one hour until the Secret Service agents arrived.

When Secret Service agents questioned Mitchell about the statements he had made in Singapore regarding President Reagan, Mitchell asserted his intention to kill the President. Mitchell was charged with violating 18 U.S.C. § 871. He moved to suppress his statements made to the Secret Service agents on the ground that his detention at the airport amounted to a *de facto* arrest without probable cause.

9

The Ninth Circuit affirmed the district court's denial of the motion to suppress, holding that the exclusionary rule did not bar prosecution of the crime charged. *Mitchell*, 812 F.2d at 1253-1254. The Court stated further that, although unlawful government conduct could provide a substantive defense in some circumstances, Mitchell's prosecution did not "offend any sense of fair treatment or fair play, regardless of the legality or illegality of his detention." *Id*. at 1254.

Similarly, the defense of outrageous government conduct does not protect Smith. "[A] defendant cannot avail himself of the defense where he has been an *active participant* in the criminal activity which gave rise to his arrest." *United States v. Yater*, 756 F.2d at 1066 (original emphasis). Smith took an active role here; Collins testified at the suppression hearing that when Smith began to talk, he spoke "very freely." There is no contrary evidence.

Further, the conduct of Holliman and Collins does not amount to an abridgement of the fundamental fairness guaranteed by the Due Process Clause. Neither Holliman nor Collins was overinvolved in the crime charged. While Smith was afforded the opportunity to express threats, he was not urged, tricked, or baited into doing so. Nor were the threats drawn from Smith by prolonged questioning.[8] *See Mitchell*, 812 F.2d at 1254-1255 ("Mitchell was

---

[8] Smith was initially informed by Holliman that Holliman's job was to protect the President and he wanted to "interview him [Smith] about his feelings towards the president," that "any talking had to be entirely voluntary," that Smith "had the right to stop talking at any time" and "the right to leave the room at any time," and that he was "not under arrest." Collins then told

10

in no way pressured or induced to make the new threat against the President."). This case is unlike those in which the outrageous conduct defense is normally asserted in which the government has instigated a sting operation and "enticed" the defendant into participating in the illegal activity. *See, e.g., United States v. Yater*, 756 F.2d at 1060-1061 (upon direction of law enforcement officials, government informants contacted defendant about

---

Smith "I didn't want him to think that he was trapped or forced to talk to someone he didn't want to talk to. And as warden of the institution, I just reassured him that he could leave whenever he wanted to." Collins testifed, without contradiction, that he then:

> "asked him several questions just to sort of put him at ease. I asked him about his parole, which he said was imminent. I asked him like, What are you going to do when you get out of the penitentiary?
>
> Q What did he say in response?
>
> A At that point, he said that he was going to kill an inmate that was still incarcerated in TDC, and then he said he was going to travel to the Mid-East. And then he just started to sort of tell his story aboutSQthat's how the president's name came up.
>
> Q So, it evolved into a conversation about the president?
>
> A Really quickly it evolved into that.
>
> Q And what did he say about the president in this interview?
>
> A He said he was going to travel to the Mid-East to Iraq, that he was a Muslim and that Saddam Hussein was the leader of the Muslim world and was his leader, and that President Bush was the leader of the Christian world and, therefore, was his enemy. And that he was going to kill him and that he would wait for the right time."

The interview lasted between an hour and a half and an hour and three quarters.

trafficking in cocaine).  Here, Smith knew the identities of both Collins and Holliman and was aware of their purpose in questioning him.  He was aware of Holliman's role with the Secret Service and of the serious implications of any threats against the President.

It was not Holliman's intent to elicit a new threat.[9]  As an agent of the governmental agency charged with the President's safety, Holliman was responsible for determining the seriousness of Smith's threat.  Questions to Smith concerning his feelings toward President Bush were therefore proper.  Although it is quite conceivable that these questions could lead, as they did in fact lead, to the renewed threat charged in Count Two, it is also plausible that Smith would attempt to conceal or minimize his hostile attitude or intentions respecting the President.  We conclude that Smith's criminal response, though perhaps probable, was not predictable with reasonable certainty and that in any event the conduct leading to it was not outrageous.

The district court was concerned about possible manipulation of Smith's psychological condition.  If the defendant suffers from a serious mental condition, it is possible that a jury may find for him on the defense of insanity.  His mental condition might also be something that could be considered at sentencing.  On the other hand, if Smith is merely mentally unbalanced, it is the government's right, and indeed it may be its duty, to prosecute him for the offense charged.  We note that it is frequently an

---

[9]    Holliman testified that "[t]he purpose was to investigate the threat and to do adequate background investigation to evaluate the threat and the danger toward the president of the United States . . . ."

unbalanced person who commits the offense of threateningSQand sometimes of attempting to killSQa president.

Finally, in dismissing Count Two, the district court was influenced by the agents' failure to give full *Miranda* warnings. Although it is true that Collins and Holliman deliberately decided not to give Smith his full *Miranda* warnings, there is no evidence of a bad faith intent to violate Smith's rights. Whether *Miranda* applied was at least less than obvious. The agents did not intend to elicit a confession to the October 23 threat and, indeed, did not even question Smith concerning his October 23 statements (see note 5, *supra*). And, as discussed above, the failure to give *Miranda* warnings does not prevent prosecution of a new crime. *Mitchell*, 812 F.2d at 1253-1254.

Further, "[t]he prophylactic *Miranda* warnings are `not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'" *Duckworth v. Eagan*, 109 S.Ct. 2875, 2880 (1989) (quoting *Michigan v. Tucker*, 94 S.Ct. 2357, 2364 (1974)). *See also Oregon v. Elstad*, 105 S.Ct. 1285, 1291-1293 (1985) (declining to extend the "fruit of the poisonous tree" doctrine to *Miranda* violations); *United States v. Harrell*, 894 F.2d 120, 125 (5th Cir.), *cert. denied*, 111 S.Ct. 101 (1990) ("The [fruit of the poisonous tree] doctrine operates only where constitutional violations arise, and *Miranda's* prophylactic warnings are not constitutional rights in and of themselves.").[10]

---

[10] *Cf. New York v. Quarles*, 104 S.Ct. 2626 at 2641, 2647-48 (1984) (Marshall, J., joined by Brennan, J., and Stevens, J.,

13

The failure to give Smith his full *Miranda* warnings did not, in and of itself, amount to a constitutional violation.

At the suppression hearing, the defense made much of Holliman's statement that he would violate a person's *Miranda* rights if he thought it necessary to protect the President. Contrary to the district court's disapproval of this sentiment, we agree with the government. While in some circumstances evidence obtained in such a situation may not be admissible in court, Holliman's mere questioning of Smith without full *Miranda* warnings did not violate Smith's constitutional rights against self-incrimination. Holliman had a duty to investigate the seriousness of Smith's threat and to ensure the safety of the President; it was not unconstitutional for Holliman to choose not to give Smith his *Miranda* warnings in order to fulfill this duty.

If this Court is ever to apply the outrageous government conduct defense, it should not apply on facts such as these, where the police conduct that leads to the new crime is appropriate and not unreasonable.

---

dissenting) ("If a bomb is about to explode or the public is otherwise imminently imperiled, the police are free to interrograte suspects without advising them of their constitutional rights. Such unconsented questioning may take place . . . when . . . advising a suspect of his constitutional rights might decrease the likelihood that the suspect would reveal life-saving information. If trickery is necessary to protect the public, then the police may trick a suspect into confessing. While the Fourteenth Amendment sets limits on such behavior, nothing in the Fifth Amendment or our decision in *Miranda v. Arizona* proscribes this sort of emergency questioning. All the Fifth Amendment forbids is the introduction of coerced statements at trial.").

## Conclusion

For the reasons stated above, the order of the district court dismissing Count Two of the indictment is REVERSED, and this cause is REMANDED for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED