**UNITED STATES of America,
Plaintiff,**

v.

**Jonathan LINCOLN, Defendant.**

**No. CR 02–208–RE.**

United States District Court,
D. Oregon.

Jan. 9, 2003.

Michael R Levine, Portland, OR, for Defendant.

OPINION AND ORDER

REDDEN, District Judge.

On May 15, 2002, defendant was indicted on one count of knowingly and wilfully, in violation of 18 U.S.C. § 871, threatening to take the life of George W. Bush, the President of the United States, by depositing in the mail, on September 24, 2001, a letter containing such a threat.

A 1–day court trial was held on October 28, 2002, and continued on November 4, 2002, for the taking of additional testimony. Thereafter, the court received additional briefing from the parties.

The matters before the court are (1) resolution of defendant's motion to dismiss the indictment because of the government's misconduct (doc. 30) and renewed motion for acquittal (doc. 31); and (2) the court's judgment of defendant's guilt or innocence based on the court trial and post-trial briefing.

### Background

Defendant is an inmate at the Oregon State Penitentiary, presently scheduled for release in May 2003.

In March 2001, prison officials informed United States Secret Service Agent Ron Wampole that, in an anger management workbook required by the penitentiary, defendant wrote statements that threatened the life of President Bush. The government summarizes those statements, and defendant does not challenge the accuracy of the summary. Gvmt. Post Trial Memo., pp. 9–10; Def. Reply to Gvmt Post Trial Memo., pp. 4–5. On page 2 of the workbook, defendant made four threats: "1. Kill people; 2. Kill Bush; 3. Kill Bush wife; 4. Kill the FBI." On page 4, defendant wrote "Something you have fun when you kill the President like Bush or Bill Cliton or his wife." On page 5, defendant wrote at the top of the page: "Kill Bush, Kill Bush, Kill Bush," and then wrote "President shread his body up into little pieces Kill his wife famialy." On page 6, defendant indicated that he thinks killing the President is a good thing to do and that killing people and hurting them makes him feel good. On page 9, defendant wrote he is going to shoot the President with a 30–06 rifle that would put a hole in the President 3–1/2 inches wide.

Approximately a month later, in April 2001, Agent Wampole interviewed defendant in the attorney/client room at the Oregon State Penitentiary for 45 minutes to one hour. He testified that he conducted the interview because of the workbook statements and that his purpose in the interview was to assess the degree of threat defendant posed to the President.

Agent Wampole said defendant was cooperative and stated he was angry with the President because his friends had lost jobs because of the President's actions. Defendant told Agent Wampole that he wanted to kill President Bush and, in reference to other threats he allegedly had made against the President, said that he really meant them. Agent Wampole testified that defendant said when he got out of prison, he would assemble a team of people to stake out the White House, watch the President, and shoot the President through an open window of his limousine. In response to a question by Agent Wampole, defendant denied making the threats in order to be placed in a federal prison instead of a state prison.

Agent Wampole testified that he reported defendant's threats in the workbook and interview to the United States Attorney's Office, which took no action against defendant at that time.

Approximately six months later, on September 24, 2001, defendant attempted to mail to President Bush the letter that is the subject of the indictment. The letter read:

President Goerge Bush

You think cause you go over there and blow them up that the killing will stop in your dream They got over 275,800 or more since, Never mind that this is only the Beging of the Badass war To come Just think Their army is over here already hiding They have more Posion gas then you know. ha ha. Too bad you don't think like them. You will see a good Job Done agin may 2 week's, maybe 2 months, 3, who know's. YOU WILL DIE TOO GEORGE W BUSH REAL SOON THEY PROMISED THAT YOU WOULD LONG LIVE BINLADEN.

Motion to Dismiss Indictment, Exh. A. Prison officials intercepted the letter before it was mailed and gave it to Agent Wampole. Thereafter, defendant was indicted for the alleged threats made in the letter.

### Motion to Dismiss Indictment—Alleged Government Misconduct

Defendant argues that the indictment should be dismissed because the government engaged in outrageous misconduct when the Agent Wampole intentionally failed to give *Miranda* warnings to defendant in the April interview at the Oregon State Penitentiary.

It is not disputed that Agent Wampole did not advise defendant of his *Miranda* rights. He said that, as a general rule, when threats are made against the President, Secret Service agents do not give *Miranda* warnings because the agents are charged with the responsibility of ascertaining the level of the threat to the President. If *Miranda* warnings are given, the person often will not cooperate and the agency will be unable to ascertain the level of threat. Agent Wampole did not tell defendant he was free to leave, but also did not threaten him or make promises to him. Defendant never asked for an attorney.

■ The defense of outrageous conduct "is available only where the conduct of the law enforcement officials is so outrageous that it violates notions of fundamental fairness implicit in the Due Process Clause of the Fifth Amendment.". *United States v. Smith,* 7 F.3d 1164, 1168 (5th Cir.1993). For an outrageous conduct defense, the defendant bears the burden of proving that he was not an active participant in the criminal activity and the government was overinvolved in the charged crime. *Id.* at 1167–68.

■ The facts in *Smith* are similar to those in this case. In *Smith,* the defen-

dant-inmate told another inmate he was going to kill the President when he got out of the penitentiary. *Id.* at 1165. The inmate reported the threats to the warden, and the warden reported the threats to the Secret Service. Thereafter, the warden and a Secret Service agent interviewed the defendant in the warden's office. *Id.* The court stated that the agent's intent in questioning the defendant was to determine whether he posed a serious threat to the President. *Id.* The defendant was not given complete *Miranda* warnings during the interview, and he made threats to kill the President. *Id.* at 1165–66.

The court assumed, without deciding, that a violation of *Miranda* had occurred. The court concluded that the defense of outrageous conduct does not apply to a Secret Service agent's questioning of an inmate to assess the seriousness of alleged earlier threats against the President without giving *Miranda* warnings. The court noted that the defendant was an active participant in the criminal activity of making threats on the President's life, and that the agent was not overinvolved in the crime charged. *Id.* at 1169. While the agent afforded defendant the opportunity to express threats in the interview, he was not pressured or tricked into doing so. The threats were not drawn from defendant by prolonged questioning. *Id.* The court noted that the case is unlike cases where the outrageous conduct defense is normally asserted in which the government instigates a sting operation and entices the defendant into participating in illegal activity. *Smith,* 7 F.3d at 1169.

In the case presently before the court, defendant was an active participant in the threats, Agent Wampole was not overinvolved, and the interview was not prolonged. As an agent of the governmental agency charged with maintaining the President's safety, Agent Wampole attempted to determine the seriousness of defen-

dant's threats. Questions concerning defendant's feelings about the President were therefore necessary and proper. Although, as in *Smith*, the questions might be expected to, and in fact did, lead to defendant's renewed threats on the President's life, it was also possible that defendant could have attempted to conceal or minimize his hostile attitude or intentions. *Id.* Thus, although defendant's criminal responses during the interview were perhaps probable, they were not predictable with reasonable certainty.

I conclude that Agent Wampole's failure to give *Miranda* warnings did not amount to outrageous conduct. Defendant's motion to dismiss the indictment because of governmental misconduct is denied.

### Renewed Motion for Acquittal

The primary issue in this case is whether the September 24th letter constitutes a true threat such that it is not protected by the First Amendment. The statute defendant is charged with violating, 18 U.S.C. § 871, provides in relevant part that "[w]hoever knowingly and willfully deposits for conveyance in the mail ... any letter ... containing any threat to take the life of ... the President of the United States ... shall be fined under this title or imprisoned not more than five years, or both." The statute initially requires the government to prove a true threat. *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).

The Supreme Court has admonished that "[w]hat is a threat must be distinguished from what is constitutionally protected speech." *Watts*, 394 U.S. at 707, 89 S.Ct. 1399. "A statute such as [18 U.S.C. § 871], which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Id.* The test of a true threat is whether defendant has intentionally made a statement wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates as a serious expression of an intention to inflict bodily harm upon or to take the life of the President, although it is not necessary that the maker explicitly indicate that he is going to kill the President for the words to constitute a true threat. *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir.2002).

The Ninth Circuit has interpreted § 871 to require

> only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President, and that the statement not be the result of mistake, duress, or coercion.

*United States v. Merrill*, 746 F.2d 458, 462 (9th Cir.1984), *cert. denied*, 469 U.S. 1165, 105 S.Ct. 926, 83 L.Ed.2d 938 (1985). *See also, Hanna*, 293 F.3d at 1087–88 (citing *U.S. v. Mitchell*, 812 F.2d 1250, 1255 (9th Cir.1987)). A defendant's intent to make or carry out a threat is not an element of the crime. *United States v. Twine*, 853 F.2d 676, 680 (9th Cir.1988).

I conclude that a reasonable person would not foresee that the September 24th letter, by itself, would be perceived as a sufficient threat by the recipient as to constitute a violation of § 871. Defendant's letter states that President Bush will die soon because an unidentified "they" promised he would. The "they" appears from the context of the letter to refer to Bin Laden followers (the Taliban, Al Queda, or the like). The letter does not state or even suggest that the President *should* be killed. Rather, the letter ex-

presses the opinion that "they" will kill him. Further, defendant may have been trying to disassociate himself from any violent action to which he referred by twice crossing out the words "us" and "we" and substituting the words "they" and "them."

Even though the letter by itself is not a true threat as a matter of law, the court must look at the entire factual context of defendant's statements in order to determine if there has been a true threat. *Hanna,* 293 F.3d at 1087–88 (citing *United States v. Mitchell,* 812 F.2d 1250 (9th Cir. 1987)). The court looks to "the surrounding events, the reaction of the listeners, and whether the words are expressly conditional." *Id.* For example, in *United States v. Merrill,* 746 F.2d at 460, the Secret Service arrested defendant after several of his letters were referred to the agency for investigation. In affirming defendant's conviction, the Ninth Circuit looked at the letters themselves and to related activities in which defendant had engaged for several years before the letters were written in 1981. The court noted that when defendant left active military duty in 1975, he began work on a cause that he viewed as a military operation against the political and military establishment. *Id.* He mailed to community leaders bizarre materials consisting primarily of collages of photocopied newspaper articles and pictures annotated by defendant with messages regarding his views. Several of the letters included macabre and bloody depictions of President Reagan along with the words "Kill Reagan." *Id.* Given the 1981 letters and their context dating back several years, the court affirmed defendant's conviction for threatening the President.

Likewise, in *Planned Parenthood v. American Coalition of Life Activists,* 290 F.3d 1058, 1078 (9th Cir.2002) (*en banc*), defendants argued that "context" means the direct circumstances surrounding delivery of the threat, or evidence sufficient to resolve ambiguity in the words of the statement. The Ninth Circuit disagreed, saying that "none of our cases has limited 'context' to explaining ambiguous words, or to delivery. We, and so far as we can tell, other circuits as well, consider the whole factual context and 'all of the circumstances.'" *Id.* (quoting *Merrill,* 746 F.2d at 462).

The *Merrill* and *Planned Parenthood* cases defeat defendant's arguments that workbook threats made six months before the crime charged in the indictment cannot be used as context because too much time elapsed between the workbook threats and the letter that resulted in the indictment. The Ninth Circuit views context as inclusive of all the relevant circumstances, without a specific time limit to what circumstances should be deemed "relevant."

Thus, in this case, two events constitute the "context" for defendant's September 24th letter: (1) the writings in his anger management workbook; and (2) his interview statements to Agent Wampole.

### (1) *Workbook Writings.*

 Defendant argues that what he wrote in his anger management workbook cannot be considered as part of the context because that material was protected by the patient-psychotherapist privilege. The government does not dispute that a patient-psychotherapist privilege may be applicable, but argues that the workbook threats fall within the "dangerous patient" exception to the privilege and thus may be considered as part of the context for determining if there existed a true threat.

At trial, Craig Mitchell testified about the anger management workbook. Mr. Mitchell is a psychiatric associate at the Oregon State Penitentiary who provides counseling, crisis management, programs, and case management for inmates. He

said he considers his role with the inmates to be much the same as a licensed psychologist with private patients, and he considers himself bound by rules governing the patient-psychotherapist privilege. He testified that inmates generally understand that what they tell him is confidential. He also testified that when he reported the statements in defendant's workbook, he did not consider himself to be violating the patient-psychotherapist privilege because he felt the situation fell within the exception for threats to self or other people. Mr. Mitchell testified that he uses the anger management workbook as a risk management tool to determine if an inmate poses a risk to himself or others. He said the workbook is also meant to encourage inmates to give vent to emotions in the context of responses to questions, and that inmates are required to answer the workbook questions. Mr. Mitchell said that although he does not recall any specific conversations with defendant, he typically does not tell inmates the workbooks will be held confidential.

The Ninth Circuit recognizes a "dangerous patient" exception to the psychotherapist's obligation of confidentiality. The exception permits disclosure of otherwise confidential information when (1) a threat of harm is serious and imminent, and (2) the harm can be averted only by means of disclosure by the therapist. *United States v. Chase*, 301 F.3d 1019, 1024 (9th Cir. 2002).

In this case, defendant's threats of harm were serious—shooting and killing the President, his wife, and others. Indeed, Mr. Mitchell testified that he viewed the workbook writings as falling within the "dangerous patient" exception because of their seriousness. Defendant also threatened imminent harm for purposes of the exception. Defendant is due to be released from the penitentiary in May 2003, which will be his first chance to carry out

his threats. He has threatened to engage in violent activities directed at the President, and others, as soon as he is released from the penitentiary. Even though defendant cannot carry out his threats until his release from the penitentiary, his articulated plan is to do as soon has he is released. I conclude that this constitutes a threat of imminent harm for purposes of the "dangerous patient" exception. The "dangerous patient" exception to the patient-psychotherapist privilege applies, and the workbook writings can be considered as part of the context of the September 24th letter.

*(2) Interview with Agent Wampole.*

■ Defendant argues that the threats he made in the interview with Agent Wampole must not be considered as part of the context because he was not given *Miranda* warnings before he made the statements. The government argues that the interview statements to Agent Wampole are admissible in spite of any lack of *Miranda* warnings because they are threats that are independent violations of 18 U.S.C. § 871. The government's position is that if defendant could have been prosecuted for making those statements, the statements are not be subject to exclusion because of failure to give *Miranda* warnings.

As mentioned earlier, Agent Wampole testified that he did not advise defendant of his *Miranda* rights. He said that as a general rule, when threats are made against the President, agents do not give *Miranda* warnings because they are trying to ascertain the level of threat to the President. If *Miranda* warnings are given, the person often will not cooperate.

As discussed above relative to defendant's outrageous conduct argument, the Fifth Circuit case of *United States v. Smith* is similar to this case and dealt not only with the issue of outrageous conduct, but also with the issue of *Miranda* warn-

ings in the context of a new crime. 7 F.3d at 1167–68. Again, *Smith* involved a defendant-inmate who told another inmate he was going to kill the President when he got out of the penitentiary. *Id.* at 1165. Thereafter, the warden and a Secret Service Agent interviewed the defendant in the warden's office and arguably did not provide sufficient *Miranda* warnings. *Id.* The court concluded that, assuming a *Miranda* violation had occurred, "the evidence of the renewed threat [during the interview] is not inadmissible due to a lack of *Miranda* warnings, because the threat constituted a new crime rather than evidence of a prior offense." *Id.* at 1167. The court concluded that "the alleged *Miranda* error does *not preclude the government from introducing evidence of,* or prosecuting Smith for, the threats made during the ... interview." *Id.* (emphasis added). Thus, under *Smith,* a new threat that is a crime may be used as evidence against a defendant, or may be the basis for a new prosecution.

The *Smith* court cites to *United States v. Mitchell,* 812 F.2d 1250 (9th Cir.1987), as support for its conclusion that a renewed threat is a new crime. *Id.* In *Mitchell,* the Secret Service received information that defendant had made threats against the President. Defendant was detained at an airport and immediately responded to the Secret Service agents by making present, new threats against the President. 812 F.2d at 1254. He was prosecuted for the "new crime"—the spontaneous statements made to the agents at the airport where they sought to question him about prior threats. The court rejected defendant's arguments that the statements at the airport were not proper evidence because of a *Miranda* violation, noting that "[C]ommitting a crime is far different from making an inculpatory statement, and the treatment we afford the two events differs accordingly. An inculpatory statement usually relates to a previously

committed illegal act.... A crime, on the other hand, whether committed by word or deed is by definition an act that violates the law." *Mitchell,* 812 F.2d at 1253.

Defendant argues that *Mitchell* is limited to situations where a defendant is prosecuted for the "new crime." Of course, defendant here is technically not being prosecuted for statements made to Agent Wampole during the interview, except to the extent those statements are a permitted part of the context. Rather, defendant is being prosecuted for the letter that followed some six months after the interview statements were made. Defendant's reading of *Mitchell* is too narrow. *Mitchell* does involve prosecution for the "new crime," but the holding does not preclude the "new crime" evidence being introduced even when the prosecution is not for the "new crime." The express language of *Smith* is that "alleged *Miranda* error does not preclude the government from *introducing evidence of* ... threats made during the ... interview." *Smith,* 7 F.3d at 1167 (emphasis added). I am convinced that defendant's threats made during the interview with Agent Wampole can be considered as evidence, even without *Miranda* warnings, because they constitute a "new crime."

■ For the reasons discussed above, I consider both the workbook writings and the interview statements as context for the September 24th letter. After the court trial and post-trial briefing, I am convinced beyond a reasonable doubt that defendant intentionally made statements in the September 24th letter that, in the context of the workbook writings and interview with Agent Wampole, constituted a "true threat," *i.e.,* were such that a reasonable person would foresee that the statements would be interpreted as a serious expression of an intention to inflict bodily harm upon or to take the life of the President of the United States. Even if I were to

exclude the interview with Agent Wampole from the context analysis, I would still conclude that the statements in the September 24th letter, in the context of the workbook writings, constituted a "true threat." I find defendant guilty of the crime charged in the indictment.

### Conclusion

The court finds defendant guilty of the crime charged in the indictment, *i.e.*, knowingly and wilfully threatening to take the life of George W. Bush, the President of the United States, by depositing in the mail, on September 24, 2001, a letter containing such a threat, in violation of 18 U.S.C. § 871.

Defendant's motion to dismiss the indictment because of the government's alleged misconduct (doc. 30) is denied, and defendant's renewed motion for acquittal (doc. 31) is denied.

IT IS SO ORDERED.