UNITED STATES of America, Plaintiff,

v.

John Edward OLSON, Defendant.

No. M 85–10 CR.

United States District Court,
W.D. Michigan, N.D.

Jan. 24, 1986.

John A. Smietanka, U.S. Atty. by Richard Murray, Grand Rapids, Mich., for plaintiff.

Varnum, Riddering, Schmidt & Howlett by Judy E. Bregman, Grand Rapids, Mich., for defendant.

## OPINION RE DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

HILLMAN, District Judge.

After a jury trial in Marquette, Michigan, John E. Olson was convicted of violating a federal statute which prohibits any person from "knowingly and willfully ... [making] any threat to take the life of or to inflict bodily harm upon the President of the United States ..." [1] At the close of all the evidence, defendant moved for a judgment of acquittal. Fed.R.Crim.P. 29(a). A ruling on the motion was reserved and the case was submitted to the jury. Fed.R.Crim.P. 29(b). Defendant's motion for judgment of acquittal is now before the court.

### LEGAL BACKGROUND

A motion for judgment of acquittal raises the single question of whether the evidence is sufficient to sustain a guilty verdict.[2] *United States v. Cox*, 593 F.2d

---

1. 18 U.S.C. § 871(a) states in full:
   "Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

2. Accordingly, in considering defendant's motion for judgment of acquittal, this court cannot examine whether it improperly instructed the jury or committed other legal errors. A federal court cannot order a new trial in response to a motion for judgment of acquittal. Advisory

46, 48 (6th Cir.1979). Under Fed.R.Crim.P. 29, a court must view the evidence in the light most favorable to the Government, *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Holloway,* 731 F.2d 378, 381 (6th Cir.1984), and avoid assessing the credibility of witnesses or the proper weight of the evidence. *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). The standard of review for claims of insufficient evidence under Fed.R. Crim.P. 29 is:

> "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

(Emphasis in original). *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Accordingly, defendant's motion for judgment of acquittal at the close of all the evidence presents the question whether "a reasonable mind might fairly [have found]" defendant guilty beyond a reasonable doubt of violating 18 U.S.C. § 871(a).[3]

▮▮▮ The essential elements of 871(a) require that the defendant must intelligently make a statement, either written or oral, in a context and under such circumstances that a reasonable person would foresee that the statement would be interpreted by persons hearing or reading it as a serious expression of an intention to inflict bodily harm upon or take the life of the President, and the statement must not be the result of mistake, duress or coercion. *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). Also, a true threat as required by this section, is a serious threat and not words uttered as a mere political argument, idle talk or jest, and full context in which the words were spoken should be considered. *Rogers, supra.*

In this country, Congress has long sought to protect the President from threats of bodily injury. *See generally* Note, Threatening the President: Protected Dissenter of Political Assassin, 57 Geo.L.J. 553 (1969). Also Note, Threats to Take the Life of the President, 32 Harv.L.Rev. 724 (1919). Section 871(a) serves a compelling governmental interest in protecting the safety of the President and in assuring his ability to perform his duties without interference. *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969). Although the Supreme Court has concluded that the statute is constitutional, nonetheless, the first amendment to the Constitution of the United States requires that courts carefully circumscribe statutes that impose criminal punishment solely on the basis of spoken words. Accordingly, federal courts have interpreted 18 U.S.C. § 871 " 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' " *Watts v. United States,* 394 U.S. at 708, 89 S.Ct. at 1401 (quoting from *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)). The elements of an offense under section 871 reflect that balance between society's interests in the first amendment liberties and society's interests in the safety and mobility of the President.

## DISCUSSION

In a single count indictment against defendant Olson, the grand jury charged that:

> "On or about July 1, 1985, in the City of Houghton, Michigan, in the Western District of Michigan, John Edward Olson, in the presence of Mrs. Marcella Romps,

---

Committee's Note to Fed.R.Crim.P. 29(c), 39 F.R.D. 69, 191 (1966). Furthermore, a federal court cannot grant a new trial *sua sponte,* after a verdict or finding of guilty. Advisory Committee's Note to Fed.R.Crim.P. 33, 39 F.R.D. 69, 195 (1966).

**3.** *See United States v. Holloway,* 731 F.2d 378, 381 (6th Cir.1984) (presenting this rendition of the standard of review under Fed.R.Crim.P. 29).

and also over the telephone to Mr. Ruben Herrmann, wilfully and knowingly did make an oral threat to take the life of and to inflict bodily harm upon, the President of the United States, using language substantially as follows: 'What do you mean I didn't threaten the President, I'll blow him away,' and 'I am threatening the life of the President today. I will take down any fed that comes to get me and when you come down here, come with plenty of firepower.' "

At about 1:45 p.m. on July 1, 1985, John Olson, a 38-year-old resident of Houghton, Michigan, entered the Downtowner Lounge in Houghton, where he was a frequent patron and well-known to the owners. After ordering a beer from the bartender/owner, Marcella Romps, the two of them began to converse about Olson's efforts to find work and the business practices of the local McDonald's restaurant. Olson soon began to criticize the Reagan administration for being pro-business. He then launched into an attack upon the President's handling of the then-unfolding TWA airliner hijacking at the Athens airport, and subsequent hostage crisis in which the United States Navy diver, Robert Stethem, was slain. Olson's anger and frustration over our government's apparent inability to "solve" the Middle East hostage crisis was symptomatic of a national debate existing at that time over the proper role our government should take to protect the lives of American citizens abroad. Olson expressed his willingness to travel to the Middle East and fight to end such incidents. He also explained to Mrs. Romps that the Federal Bureau of Investigation ("FBI") kept surveillance records on his activities. In order to prove that claim, he first requested Mrs. Romps to obtain verification from the FBI located in Marquette, Michigan, approximately 100 miles away. When she failed to make the requested telephone call, Olson himself called the FBI office in Marquette and spoke with FBI Agent Reuben Herrmann. Olson demanded that the FBI turn over its records on him and further, to conduct a background investigation on his activities. Although

Olson's comments to Mrs. Romps and to the FBI agent on the telephone were not at all times totally rational, it is apparent that Olson was anxious for the FBI to come over to Houghton and to confront him in the Downtowner Lounge. Agent Herrmann explained to Olson that he knew of no records concerning him and that the FBI does not undertake investigative activities solely at the bequest of private citizens. Olson became more agitated and handed the telephone to Mrs. Romps.

Out of the presence and hearing of Olson, Mrs. Romps told Herrmann that Olson was a familiar patron at the Downtowner Lounge and was angry about the hostage crisis in the Middle East. She told Herrmann she was frightened since Olson was talking about killing people in her bar, and perhaps holding them hostage. In addition, he told her that he himself wanted to die. Agent Herrmann explained to Mrs. Romps that the FBI could not become involved unless it was established that Olson had violated some federal law, such as threatening the President. At this point, Agent Herrmann specifically asked Mrs. Romps whether Olson had threatened the President of the United States. Mrs. Romps replied that Olson had made no such threat. Agent Herrmann then said that he could not become involved, but would call the local police in Houghton to come over to investigate the disturbance. After this telephone conversation, Herrmann did in fact telephone the Houghton Police requesting them to investigate the matter.

After speaking with Agent Herrmann, Mrs. Romps resumed her conversation with Olson. She explained that the FBI would not become involved because he had not violated a federal law. She specifically told Olson (as FBI Agent Herrmann had explained to her) that since he had not threatened the President, for example, no federal offense had been committed, and the FBI would not become involved, and Herrmann would not come to Houghton. In response to this suggestion, Olson immediately said, "What do you mean, I didn't threaten the

President. I'll blow him away." That statement, in reply to Mrs. Romps' suggested explanation, constitutes Olson's first alleged threat against the President. Mrs. Romps then told Olson she was sure he did not actually wish to threaten the President, but Olson retorted that he would call the FBI and threaten the President. These events occurred between 2:30 p.m. and 2:50 p.m. on July 1, 1985.

At approximately 2:55 p.m., Olson again telephoned the Marquette office of the FBI. Olson apparently could not immediately speak with Agent Herrmann and, instead, left his name and the telephone number of the Downtowner Lounge. Agent Herrmann returned Olson's call a few minutes later. During the second telephone conversation, Olson continued to express his general displeasure with the Reagan administration, specifically, his criticism of our government's response to the current Middle East hostage crisis. Olson then said, "I am threatening the life of the President today. I will take down any fed that comes to get me and when you come down here, come with plenty of firepower." That statement constitutes the second alleged threat Olson made against the President. Following this telephone call, Olson again threatened to kill the bar patrons and made reference to a one-half hour deadline he was giving the FBI to come to get him. Meanwhile, Agent Herrmann called the Secret Service Office in Grand Rapids, Michigan, and spoke with Agent Shannon. At the direction of Shannon, another agent of the Grand Rapids Secret Service office telephoned the Houghton Police Department and requested that Olson be arrested for further investigation.

After Olson's second conversation with Agent Herrmann, Mrs. Romps became more frightened about her safety and her patrons' safety. Olson was making wild threats about harming the people in the bar unless he was arrested. At 3:17 p.m., Mrs. Romps called the FBI office in Marquette and asked agent Herrmann whether he had called the local police because she feared for her immediate safety. Shortly after that call, Olson, after making several glances at the clock in the bar, grew impatient while waiting to be arrested and left the bar for his apartment. The bar patrons, fearing for their own safety, kept a close watch on him as he walked out of the bar and down the sidewalk to his apartment. About one-half hour after Olson left the bar, Houghton police officers arrived at the Downtowner Lounge. The police officers then went to Olson's apartment and arrested him without incident at about 4:30 p.m., which was more than 90 minutes after the Houghton Police Department was first notified of the disturbance at the Downtowner Lounge some six blocks away from the police department. From the testimony at trial, it was apparent that Olson believed at the time of his arrest that the Houghton Police Officers were FBI agents.

Several occurrences concerning the involvement of the Secret Service in this case warrant special mention. First, Secret Service Agent Shannon, who authorized Olson's arrest, did not learn until the day following Olson's arrest that Olson did not allegedly threaten the President until the "suggestion" had been made by Agent Herrmann and relayed to Olson by Mrs. Romp. Second, on July 9, 1985, approximately a week after Olson's arrest, Secret Service Agent Shannon, following his official investigation of this incident, included in his report that Olson was not a source of danger to the President. Finally, although Olson spoke of weapons that he supposedly possessed, neither Federal nor local law enforcement officers searched Olson's apartment. In addition, following Olson's arrest, his apartment was left unsecured.

Viewing the preceding facts in the light most favorable to the government, I am convinced that insufficient evidence existed at the close of all the proofs for any rational trier of fact to have found the essential elements of this crime beyond a reasonable doubt. Although Olson presented credible evidence that he suffered from an alcohol induced blackout at the time of the "threats," no doubt exists that Olson uttered the words alleged to constitute the threat. Defendant now contends that a

reasonable jury could not fairly have found him guilty beyond a reasonable doubt on the basis of the two remaining elements of 18 U.S.C. § 871(a): (1) whether the words constituted a "true threat," and (2) whether the words were spoken "knowingly and willfully."

A. *The "True Threat" Element.*

■ In *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), the Supreme Court found that a threat must amount to a "true threat" to fall within the prohibition of 18 U.S.C. § 871(a). In *Watts,* the alleged threat occurred at a public rally on the Washington Monument grounds protesting police brutality. In response to a comment that young people should receive more education before expressing their views, the defendant retorted:

"They always holler at us to get an education. And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday morning. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."

*Watts,* 394 U.S. at 706, 89 S.Ct. at 1401.

On the basis of this statement, the jury found Watts had committed a felony by knowingly and willfully threatening the President. The Court of Appeals for the District of Columbia affirmed the conviction. The Supreme Court, however, reversed holding the district judge was in error in not having granted defendant's motion for judgment of acquittal. The Court stated: "[t]aken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners," defendant's threat did not constitute a true threat within the scope of outlawed speech under 18 U.S.C. § 871(a).

What then is a true threat? First of all, it is clear that determination of whether a defendant's words constitute a true threat requires review of the entire factual context of defendant's statements. There can be no question that the threat must be serious, as distinguished from words uttered as mere political argument, idle talk or jest. In essence, it is an avowed present determination or intent to injure presently or in the future, and in interpreting this section, the courts have uniformly held that it is the making of the threat, not the intention to carry it out, that violates this section.

Generally, what is or is not a true threat is a jury question. *United States v. Carrier,* 708 F.2d 77 (2d Cir.1983). Nonetheless, as in *Watts,* some cases exist when a court should determine as a matter of law that a particular threat does not constitute a "true threat." This is such a case. It is undisputed that Olson spoke his threatening words in the context of his political views primarily against the foreign policies of President Reagan. The TWA hostage crisis was just unfolding. The story was in the headlines of all the newspapers across the country, and the question of how to deal with terrorists was widely discussed. In addition, although it is the making of the threat, not the intention to carry it out, that violates the statute; nevertheless, the context in which the "threat" is made cannot be ignored. Olson's ill-advised remarks were made in a bar in Houghton, Michigan, 970 miles from Washington; no weapons were ever discovered in his possession; his "threat" was made for a purpose other than harming the President, that is, to get the FBI agent in Marquette to come to Houghton; and finally, the threat was in direct response to a suggestion or provocation initiated by the agent and relayed to Olson through Mrs. Romps. In addition, his "threats" contained no specification of time, place or date. *See United States v. Callahan,* 702 F.2d 964 (11th Cir.1973) (where threats on letters mailed to the President and Vice President were held to constitute "true threats" where the letters specified a particular time, date and place, and the sender threatened to travel to Washington, D.C.).

It is important to note that no evidence exists that Mrs. Romps, who was present and heard Olson's "threats" ever considered Olson's words against the Presi-

dent a serious threat. The patrons at the bar generally ignored Olson's comments about politics and the President, and apparently believed that Olson "wanted to make a point that he was mad about the hostage situation." In addition, there is some indication that Olson's threats were in fact conditional. There was testimony that he would give the FBI and other law enforcement officers about 30 minutes to arrest him. And, finally, as previously mentioned, Olson only "threatened" the President after Mrs. Romps' and Agent Herrmann's comments that no federal law had been violated and Herrmann could not become involved as Olson wished since there had been no threat to the President.

Although several witnesses testified that Olson spoke in a serious manner, his words against the President were not treated as serious threats by those with complete knowledge of the context. *See United States v. Frederickson*, 601 F.2d 1358, 1364 (8th Cir.1979). Secret Service Agent Shannon testified that at the time he ordered Olson's arrest, he did not know the context of Olson's comments, nor did he know that Olson's "threats" were only made after the suggestion had been made to him by the FBI agent. After approximately a week of investigation, Shannon prepared a written report on the incident and concluded that Olson was not a source of danger to the President, and Olson was released on bond. Obviously, the Secret Service Agent concluded that the threat was not a "real threat." In addition, the seriousness with which law enforcement officials treated Olson's "threats" against the President is belied by their failure even to search or to secure Olson's apartment after the alleged threats.

Agent Herrmann, Mrs. Romps and the patrons at the bar considered the events in the bar on that afternoon a serious affair, not because of any threat to the President, but because of Olson's unprovoked and frightening threats against the persons in the bar. No question exists that Olson upset and frightened those patrons. They rightfully feared for their physical safety. Nevertheless, it is important to bear in mind that Olson is not charged in this court with terrorizing and frightening the people in the Downtowner Lounge. That was a matter for the local law enforcement officers. Instead, the Federal Government charged him with threatening the President.

In summary, considering the language against the President was made during an international hostage crisis involving American citizens; provocation by the FBI agent; Olson's motive to bring the FBI agent to Houghton unrelated to the welfare of the President; and the listeners' lack of concern regarding the words spoken against the President, I conclude that Olson's "threats" against the President did not constitute "true threats" as a matter of law.

### B. The "Knowingly and Willfully" Element.

■ In addition, I am satisfied that all reasonable jurors must conclude beyond a reasonable doubt that Olson's alleged threats were not uttered "knowingly and willfully." Despite the Supreme Court's "grave doubts" for an objective construction to the requirement of "knowingly and willfully," the Sixth Circuit has specifically adopted that standard. *United States v. Vincent*, 681 F.2d 462 (6th Cir.1982). I am convinced that under this standard, the Government failed to present sufficient evidence that a reasonable person in Olson's position as speaker "would have foreseen that the statements he made would be understood as indicating a serious intention to commit the act." *Rogers v. United States*, 422 U.S. 35, 44, 95 S.Ct. 2091, 2097, 45 L.Ed.2d 1 (1975) (Marshall, J., concurring) (stating the objective standards under 18 U.S.C. § 871). Many of the same factors that convinced me that Olson did not make a "true threat" also bring me to the conclusion that Olson did not utter the words against the President "knowingly and willfully." Both of the listeners of Olson's threats, that is, Mrs. Romps and Agent Herrmann, knew that Olson's words were in response to the suggestion that the FBI

would only become involved if Olson violated a federal law such as threatening the President. The listeners also knew that Olson had neither the means nor the intent to travel over 950 miles to Washington, D.C., to carry out his alleged threats against the President.

Mrs. Romps testified she knew that Olson lived in Houghton, Michigan, and was a part-time cook in a nearby tavern. She testified that she considered Olson's outburst in the Downtowner Lounge on July 1, 1985, a serious affair because of his threats against the people in her bar. Consequently, under these circumstances, a reasonable person would not have foreseen the statements he made would be understood as indicating a serious intention to commit the act. In addition, the alleged threat spoken to Agent Herrmann indicates that Olson had no intent to carry out his threat against the President and was in effect pleading with the FBI agent to come to Houghton and pick him up at the Downtowner Lounge. Olson said to Herrmann, "I am threatening the life of the President today. I will take down any Fed that comes to get me, and when you come down here, come with plenty of fire power." Given Olson's earlier telephone conversation with Agent Herrmann, in which Olson asked for his FBI "records," and Olson's plea for a confrontation with the FBI in the Downtowner Lounge, a reasonable person would not have foreseen that Agent Herrmann would understand Olson's statement to be a serious threat. Under the facts of this case, therefore, I am satisfied that all reasonable jurors would, as a matter of law, have had a reasonable doubt concerning whether Olson "knowingly and willfully" threatened the President.

## CONCLUSION

After viewing the evidence in the light most favorable to the prosecution, I find from all the evidence that no rational trier of fact could fairly have found beyond a reasonable doubt the essential elements of the crime; specifically, that Olson's threats constituted "true threats" or were uttered "knowingly and willfully."

Accordingly, defendant's motion for judgment of acquittal is granted.