28 F.3d 109
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Keith Richard KERNA, Defendant-Appellant.
 No. 92-50739.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 3, 1993.
Decided July 8, 1994.
 
 1
 Before: FLETCHER, PREGERSON and NORRIS, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Keith Richard Kerna appeals his conviction on two counts of threatening the Vice President in violation of 18 U.S.C. Sec. 871(a). He contends that the trial court erred (1) in denying his motion for acquittal under Fed.R.Crim.P. 29; and (2) in denying his motion to dismiss one count of the indictment as multiplicitous. The district court had jurisdiction under 18 U.S.C. Sec. 3231. We have jurisdiction under 28 U.S.C. Sec. 1291, and we affirm.
 
 BACKGROUND
 
 4
 On March 10, 1992, Kerna called the White House on a public access line and made certain remarks concerning Vice President Quayle. The White House telephone operator, Linda Knight, deemed his remarks threatening enough to warrant transferring the call to the Secret Service, but Kerna hung up before Knight was able to put his call through. Kerna called back again shortly thereafter, and this time Knight was able to transfer the call. Agent James Manion, sitting at the Secret Service Duty Desk, listened while Kerna said
 
 
 5
 ... [peo]ple involved they don't let me talk. Up the down staircase, Dodge City, I go to the VA, they go to the United Way, Vice President Quayle is dead. Now they're censoring my mail, I sent you a, I sent, I sent, I sent your bureau a 93 topic index that I had time to type up around all the avoidance. Syndicate, Mafia, I don't know how you spell it. And it is going to be with one of my father's rifles, there were two of them identical. That's also on the way in the mail to you. I can give you a list of items of mail censorship if you will allow it.
 
 
 6
 Trial exhibit 1-A at 1. After telling Manion that he was at a pay phone in a hotel in Long Beach, California, Kerna hung up. Manion had taped the call.
 
 
 7
 An hour later, Kerna called the White House again and was again transferred to Manion. Manion put in a fresh tape and listened while Kerna described, incoherently, problems he was experiencing with censorship of his mail. After Manion began to respond, the following colloquy took place:
 
 
 8
 Kerna Look, if you don't want to make this false report, and you're the criminal, and I say the Vice President of America, Mr. Quayle, is going to be killed ...
 
 
 9
 Manion Yeah, but wait, wait, wait ...
 
 
 10
 Kerna ... with one of two 30-06 rifles ...
 
 
 11
 Manion Wait a second, I'm trying to help you.
 
 
 12
 Kerna You make false reports ...
 
 
 13
 Manion Ah, wait, I'm trying to ...
 
 
 14
 Kerna You're trying to trick me, you won't let me talk.
 
 
 15
 Manion I'll let you talk, I'll let you talk. Tell me what you want, you know.
 
 
 16
 Kerna He's gonna be killed with one of two 30-06 rifles, that my father, Nicolai Kerna, went hunting with my older brother, the other one was his.
 
 
 17
 Manion Okay, okay. Well keep ... you know, I don't want to, I don't want to stop you. So ...
 
 
 18
 Kerna You keep an eye, you keep an eye out ...
 
 
 19
 Manion What's that?
 
 
 20
 Kerna ... you keep an eye out.
 
 
 21
 Trial exhibit 2-A ("ex. 2-A") at 2. The topic then shifted to mail censorship.
 
 
 22
 Some of Kerna's subsequent discourse was clearly delusional: for instance he accused Manion (in D.C.) of going into his hotel room (in Long Beach) and taking his cigarettes. Most of the rest of it was rambling and incoherent. Major topics of conversation were mail censorship; the loss through the mails of veteran's benefits checks; a topic index which apparently had information about threats to the Vice President; Phoenix, Arizona; and hunting trips, some with family members.
 
 
 23
 On several occasions, Manion attempted to bring the conversation back to the Vice President. After Kerna described a youthful incident involving a rifle, and said that he no longer had any deadly weapons, Manion asked him whether or not he was happy with the Vice President. Kerna responded "I cannot say at this time," and then mentioned that he had been in Phoenix during Quayle's trips there. Ex. 2-A at 11. When Manion next brought up the topic of "threatening the Vice President," Kerna referred him to his uncle, whom he seemed to be saying might be able to help out with information about threats. Ex. 2-A at 14-15. Later, Kerna spontaneously stated that he had served time for "hopping the White House fence." Ex. 2-A at 16-18. Manion asked him if he had made any threats at that time, and Kerna declined to answer. Then, in a portion of the conversation which was not recorded because the tape had run out, Manion told Kerna that he was trying to help him to get benefits, but that Kerna's threatening calls to the White House would not help his case. Manion then asked Kerna if he had made a threat concerning the Vice President; Kerna responded "it is a promise," and said that Quayle would be "shot on sight." Tr. at 37.
 
 
 24
 Eventually, Manion realized that the tape had run out. He turned the tape over and recorded the latter portion of the conversation, which concerned hunting and mail censorship, and which continued until local police appeared and arrested Kerna.
 
 
 25
 In his holding cell at the Long Beach Police Department, Kerna was visited by Secret Service Agent Bodigheimer, who read Kerna his Miranda rights. When asked if he understood those rights, Kerna said that he had a message only for the Vice President, and declined to speak further.
 
 
 26
 The government filed a two-count indictment, charging Kerna in both counts with violating 18 U.S.C. Sec. 871(a) by threatening to kill the Vice President. Count 1 was based on the first part of the second of the two phone calls taken by Manion, in which Kerna stated that the Vice President would be killed with one of two 30.06 rifles. Count 2 was based on the first phone call, in which Kerna stated "Vice President Quayle is dead ... and it is going to be with one of my father's rifles."
 
 
 27
 After the government had presented its case, the defense moved for a judgment of acquittal under Fed.R.Crim.P. 29, on the ground that the statements quoted in the indictment did not constitute threats. The court denied the motion and found Kerna guilty as to both counts.
 
 
 28
 Before sentencing, Kerna moved to dismiss one of the two counts as multiplicitous. The court denied the motion, and sentenced Kerna to a term of seven months on each count, to run concurrently. Upon learning that Kerna had already been in jail for nine months, the court sentenced Kerna to time served and three years of supervised release.
 
 DISCUSSION
 1. Motion for Acquittal
 
 29
 We review the denial of a motion to acquit " 'in the light most favorable to the prosecution,' determining whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Orozco-Santillan, 903 F.2d 1262, 1264 (9th Cir.1990) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original).
 
 
 30
 Under 18 U.S.C. Sec. 871(a), it is unlawful knowingly or willfully to threaten to take the life of, kidnap, or inflict bodily harm on the Vice President. Kerna argues that the government showed neither that he threatened the Vice President's life nor that he did so with the requisite intent.
 
 
 31
 a. True threat
 
 
 32
 This circuit has defined threat, for the purposes of Sec. 871, as "a serious expression of an intention to inflict bodily harm upon or to take the life of the [Vice] President"; the expression must be made in the absence of mistake, duress, or coercion. United States v. Mitchell, 812 F.2d 1250, 1255 (9th Cir.1987). This definition is bounded by First Amendment concerns: the Supreme Court explained in Watts v. United States, 394 U.S. 705, 707 (1969), that because Sec. 871 criminalizes speech, the statute "must be interpreted with the commands of the First Amendment clearly in mind." Thus the government, to prevail, must prove that a statement is a "true threat." Id. at 708.
 
 
 33
 Whether or not words constitute a true threat "must be determined in light of the entire factual context of the defendant's statements." Mitchell, 812 F.2d at 1255. Factual context includes, among other things, surrounding events and the reaction of the listeners. Id.; United States v. Gilbert, 884 F.2d 454, 457 (9th Cir.1989), cert. denied, 493 U.S. 1082 (1990). These extrinsic factors assume particular importance in this case because Kerna's primary argument is that the statements on which the indictment was based were not threats but warnings.
 
 
 34
 The language Kerna used is sufficiently cryptic and indirect that the charged statements cannot necessarily be classified as threats on their face. Saying that the Vice President will be killed, even if followed by an allusion to a weapon owned by a family member, is not in the same category as such clear-cut threats as "I will assassinate the Vice President Quayle after dawn"--which Kerna had said on a different occasion he would do.
 
 
 35
 Thus the government relies in large part on extrinsic factors, which it argues indicate that the charged statements were indeed threats. The government points out, first, that Manion (a contemporaneous listener) perceived statements made in the second conversation as threats; and second, that "surrounding events" in the form of other remarks made in the series of conversations between Kerna and Manion and Knight highlighted the threatening nature of the charged statements. On the latter point, the government suggests that the two charged statements were framed by other statements indicating danger to the Vice President: on the one hand, the remark which impelled Knight to involve the Secret Service in the first place; on the other hand, the untaped statements that Quayle would be shot on sight, and that Kerna's communications with the Secret Service constituted a "promise."
 
 
 36
 The government also points to other statements in Kerna's second lengthy conversation with Manion, and suggests that these statements, while not threats in themselves, indicated that the charged statements were. In this category are Kerna's spontaneous reference to time he had served for jumping the White House fence, and his repeated references to Phoenix and to Quayle's contemporaneous visits to that city. Finally, the government contends that Kerna's post-arrest remarks cast a sinister light over the earlier taped statements: Kerna limited his comments to the cryptic remark that he had a message only for the Vice President.
 
 
 37
 Kerna's primary argument on appeal is that the charged statements were not threats because they are most reasonably seen as warnings ("you keep an eye out"), albeit deluded ones. Kerna goes on to argue that in a situation where the government has failed to dispel the ambiguity about what a statement means, acquittal is mandated. He cites United States v. Barcley, 452 F.2d 930, 933 (8th Cir.1971), in which the Eighth Circuit held that
 
 
 38
 [w]here a communication contains language which is equally susceptible of two interpretations, one threatening, and the other nonthreatening, the government carries the burden of presenting evidence serving to remove that ambiguity. Absent such proof, the trial court must direct a verdict of acquittal.
 
 
 39
 Kerna argues that since his statements could have been construed either as warnings or as threats, the trial court erred in denying his motion for acquittal.
 
 
 40
 This argument fails for two reasons. First, the Ninth Circuit has never adopted Barcley's approach,[1] under which the government loses as a matter of law if the statement at issue is ambiguous and the government produces no evidence other than the statement itself. The Ninth Circuit's rule is that "[w]hether any given form of written or oral expression constitutes a true threat for the statute's purposes is a question for the trier of fact under all of the circumstances." United States v. Merrill, 746 F.2d 458, 462 (9th Cir.1984), cert. denied, 469 U.S. 1165 (1985).[2]
 
 
 41
 Second, even if this circuit followed Barcley, that case would not apply here. By its own terms, Barcley pertains only to situations in which no extrinsic evidence is introduced. 452 F.2d at 934 & n. 6. Here, by contrast, the government relied heavily on extrinsic evidence. Thus Barcley is neither authoritative nor factually apposite.[3]
 
 
 42
 We also reject the suggestion that when Kerna's statements are viewed in the context in which they were made, the only possible interpretation is that they were deluded warnings. It is true that after Kerna had made the charged statements, he changed the subject completely, and became reluctant to say anything more about Quayle. We also note that at one point in the conversation Kerna told Manion that he had no deadly weapons. And we acknowledge that when the taped conversations are considered in their entirety, the charged statements appear to be the products of mental imbalance. Indeed, there is some indication that this is how Manion initially understood the first of the two charged statements: while he testified that he regarded the second statement as a threat, he described the first statement as "gibberish."
 
 
 43
 This circuit has held, however, that a statement may be gibberish and still be a threat. The defendant in Mitchell, who was convicted for making the statement "I'm going to kill Reagan," had also said that he was Mahatma Gandhi and the son of Nehru, and that he had a guerrilla army in the Phillippines. 812 F.2d at 1252. He argued on appeal that given these latter contemporaneous statements, the charged statement should have been regarded as "ludicrous and made in jest." The court rejected that argument, explaining that
 
 
 44
 [a]lthough it is true that a series of bizarre remarks may tend to lower a person's credibility, potential assassins may well be irrational. Hence to dismiss threats merely because a person expresses himself in an outlandish, illogical manner may defeat Sec. 871's purpose of apprehending people who potentially pose a threat to the President.
 
 
 45
 812 F.2d at 1256. This reasoning lays to rest the argument that Kerna's statements should not have been understood as threats in light of his obvious mental unbalance.[4]
 
 
 46
 Thus while more than one interpretation of the charged statements may be possible, this is not sufficient to show, when the evidence is viewed in the light most favorable to the prosecution, that no rational fact-finder could have found that the statements were threats. "[M]ost cases arising under this statute [Sec. 871] present widely varying fact patterns that should be left to the trier of fact." Merrill, 746 F.2d at 463. This case falls within that category.
 
 
 47
 b. Intent
 
 
 48
 Intent, the second element of a Sec. 871 offense, presents a simple question here. The parties agree that the statute's willfulness requirement does not refer to an intent to carry out the threat. Kerna argues, however, that the government must prove that he intended to make a threat--and that the government entirely failed to prove this.
 
 
 49
 Kerna is wrong. In language quoted in Kerna's own brief, this court held that Sec. 871 requires
 
 
 50
 only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the [Vice] President, and that the statement not be the result of mistake, duress, or coercion.
 
 
 51
 Roy v. United States, 416 F.2d at 874 (emphasis added). Thus the requirement is not that the threat is intentional, as Kerna argues, but only that the statement is, and that a reasonable person would foresee that the statement would be understood as a threat. This court has explained that Roy requires "an objective, general intent showing," United States v. Twine, 853 F.2d 676, 680 (9th Cir.1988), and has repeatedly affirmed this objective test in the context of Sec. 871. Mitchell, 812 F.2d at 1256; Merrill, 746 F.2d at 462 (collecting authorities). As Merrill explains, "[u]nder section 871, the threat itself is the crime." Id.
 
 
 52
 Kerna does not argue that the government has failed to make the minimal showing required under the objective test, i.e., that his statements were intentional. Thus with respect to the second element, as with the first, we affirm the district court's denial of Kerna's motion for acquittal.
 
 2. Motion to Strike Multiplicitous Counts
 
 53
 Kerna's second argument is that the district court erred by denying his motion to dismiss either Count 1 or Count 2 as multiplicitous. He contends that the two counts referred to a single offense, and that because he was sentenced on both counts, his right to be free from double jeopardy was violated. We review claims of double jeopardy violation de novo. United States v. Meza-Soria, 935 F.2d 166, 167 (9th Cir.1991).
 
 
 54
 In order to ascertain whether or not counts of an indictment are multiplicitous, "[t]he court applie[s] the traditional test which determines whether each count requires proof of a fact which the other does not." United States v. Kennedy, 726 F.2d 546, 547-48 (9th Cir.), cert. denied, 469 U.S. 965 (1984) (internal quotations omitted). A case closely on point is United States v. Moore, 653 F.2d 384, 390-91 (9th Cir.), cert. denied, 454 U.S. 1102 (1981), in which the defendant was charged with three counts of soliciting money in exchange for promising not to testify. Two of the counts were based on two telephone calls in which defendant made the same offer to the same person. The Moore court held that the separate charges based on the separate calls were not multiplicitous, explaining that
 
 
 55
 because each call ... requires proof distinct from the other ... the calls do not constitute a single continuing violation. Appellant's purpose in making the calls, it is true, was constant; but it does not follow that each attempt "to market" his testimony must be considered a single transaction.
 
 
 56
 Moore, 653 F.2d at 391.
 
 
 57
 Similarly, the Kennedy court concluded that three counts of making false statements to a federally insured bank were not multiplicitous: although they were made to the same bank, with the purpose of securing the same loan, they involved different statements, and the purpose of the statute was to proscribe false statements. 726 F.2d at 548.
 
 
 58
 Focusing on statutory purpose here, we reach the same result that the court reached in Kennedy. It is true that Sec. 871 prohibits "threats" rather than "statements," and it might be argued that after Kerna had spoken with the Secret Service the first time, the threat had been established, and the second call could add little that was new. The second call, however, may well have increased the level of threat, and thereby caused more of the mischief that the statute is intended to prevent--interference with the free movement of top government officials. See Roy v. United States, 416 F.2d at 877.
 
 
 59
 We reach the same result when we focus on the proof required for a conviction under the two different counts. Here, the government introduced two different tape recordings and two different transcripts of the two calls to prove its case under the two counts.[5] We note that under Moore, it is not fatal that the statements were made to the same person, nor that they contained partially similar threats.
 
 
 60
 The authorities cited by Kerna are of little assistance to his case. He relies primarily on United States v. Robin, 693 F.2d 376 (5th Cir. 1982), in which the Fifth Circuit addressed the issue not of multiplicity but of duplicity -- too many offenses per count, rather than too many counts per offense. The defendant in Robin was accused of making three threats against President Reagan, all to different people, all on the same evening. The three charged under the same count. The court held that this was not improper, and stated
 
 
 61
 We find that the threatening statements could be consolidated in a single count because they were part of a single, continuing scheme that occurred within a short period of time and that involved the same defendant. The consolidation is proper and thus the indictment is not duplicitous notwithstanding that each statement alone might constitute an offense.
 
 
 62
 693 F.2d at 378 (emphasis added). This last sentence largely defaltes the argument that Robin requires combining the two statements into a single count in this case. The Robin court explicitly recognized that the non-duplicitous statements might nevertheless constitute separate offenses -- thus apparently suggesting that prosecutors have some freedom of choice, and that they might draw up an indictment in two different ways and yet not run afoul of either multiplicity or duplicity rules in either.
 
 
 63
 Kerna's other cases are similarly unhelpful: they involve situations in which the government mistakenly charged conspiracy defendants with multiple charges for multiple underlying acts which were part of the same conspiracy, grounded on the same agreement. Using the same approach articulated in Kennedy, these cases held that this was improper, because the gist of the crime of conspiracy is an agreement. Launius v. United States, 575 F.2d 770 (9th Cir.1978); United States v. Noah, 475 F.2d 688, 693 (9th Cir.), cert. denied, 414 U.S. 1095 (1973), both citing Braverman v. United States, 317 U.S. 49 (1942). But that approach, as we explained above, leads in this case to the conclusion that there is no multiplicitousness, because the gist of a Sec. 871 violation is a threat, and Kerna made two of those.
 
 
 64
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Barcley itself was decided by a divided court, and has been criticized by at least one other circuit. United States v. Maisonet, 484 F.2d 1356, 1358 (4th Cir.1973), cert. denied, 415 U.S. 933 (1974)
 
 
 [2]
 Merrill did recognize that the question of threat might occasionally be resolved as a matter of law. 746 F.2d at 462 (citing Watts, 394 U.S. 705). That exception, however, pertains to cases in which the threat is clear, not to those in which it is ambiguous. Id
 
 
 [3]
 Other cases relied on by Kerna are also distinguishable. In United States v. Olson, 629 F.Supp. 889 (W.D.Mich.1986), the district court granted defendant's motion for acquittal despite the fact that defendant said to an FBI agent "I am threatening the life of the President today. I will take down any fed that comes to get me." 629 F.Supp. at 893. In that case, however, none of the listeners perceived the statement as a serious threat. In addition, it was very clear that the defendant in Olson was deliberately using the statement in order to get federal officials involved in his case--since he had been bragging to a bartender and gathered drinkers that the FBI already was interested in him, and since he had been told that the only way to get the FBI involved was to commit a federal offense such as threatening the President. 629 F.Supp. at 892-95. Kerna also relies on United States v. Taylor, 759 F.Supp. 804 (S.D.Fla.1991). That case is factually distinguishable in many ways, and in any event has been reversed. 972 F.2d 1247 (11th Cir.1992)
 
 
 [4]
 At oral argument, counsel for Kerna explained that he chose not to pursue an insanity defense for tactical reasons
 
 
 [5]
 This is more than a fortuity stemming from the physical state of the evidence. Even if the conversations had been recorded on the same tape, or typed up in the same transcript, the counts would require different proof simply because they involve different statements made in different conversations